**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
───────────────────────────────

**UNITED STATES OF AMERICA,**

                **Plaintiff,**

                **v.**                          **06-CR-284S**

**JOSE MADERA,**

                **Defendant.**
───────────────────────────────


## REPORT, RECOMMENDATION AND ORDER

        This case was referred to the undersigned by the Hon. William M. Skretny in accordance with 28 U.S.C. § 636(b)(1) for all pretrial matters and hear and report upon dispositive motions.


## PRELIMINARY STATEMENT


        The defendant, Jose Madera ("the defendant"), is charged in a Superseding Indictment with having violated Title 21 U.S.C. §§ 846 (Count 1), 841(a)(1) and 841(b)(1)(B) and Title 18 U.S.C. § 2 (Count 6).  (Docket #128).


        The defendant has filed a motion seeking to suppress evidence obtained pursuant to three (3) wire intercept orders and a search warrant authorizing the search of a "1997 red Mercury Villager van."  (Docket #148).

The government has filed a response in opposition to the defendant's motion.  (Docket #151).

## A.      Defendant's Motion to Suppress Evidence Resulting from Wire Intercept Orders.

### FACTS[1]

Sometime in March or April 2005, the FBI became aware of drug trafficking activity being carried out by the defendants Enrique Sexto and Jose Lao in the Western New York area and northern Pennsylvania.  (T. 6 - 7).  An investigation was initiated and "physical surveillances, consensually recorded telephone calls, attempted consensual recorded telephone calls and controlled narcotics purchases" were conducted by the FBI as part of this investigation.  (T. 7).  It was determined "that there were numerous individuals that were actually engaged in the conspiracy to distribute heroin" and the aforesaid investigative techniques were used to determine "the full scope of the conspiracy" and to "collect information on the individuals [involved], who they associated with, vehicles that are being driven, items of movement, that sort of thing."  (T. 7 - 8).  However, the agents conducting the investigation were not able "to obtain evidence as to conversations that were being made between the people [they] were watching."  Also, it became apparent to the agents that the individuals being investigated "knew they were being watched or suspected they were being watched by

---

[1]     An evidentiary hearing was held by this Court on December 6, 2007 in the case of *United States v. Sexto*, a co-defendant herein, and the facts herein are taken from the transcript of the testimony given at that hearing and from the exhibits received at said hearing. References to this transcript will be designated "T" followed by the appropriate page number.

law enforcement" based on information received from confidential sources.  (T. 8-9, 59).

The suspects in this investigation "had numerous people out and about, expanded area,

(*sic*) two to three blocks out just looking for people out of the ordinary that might be law

enforcement."  (T. 10).  An e-mail exchange on the issue of using pole cameras took

place in September 2005 between S.A. Yervelli and a representative in the office of

Chief Division Counsel of the FBI. "The substance of the communication would have

been to determine what legal issues would have needed to be addressed" in order to

obtain authorization from the Chief Division Counsel's office for the installation of pole

cameras. (T.23-25, 64-65). A formal request seeking approval for "a technical site

survey for pole cameras and a subsequent installation of pole cameras for the purpose

of capturing surveillance intelligence on [the] subjects of [the investigation] as well as

license plate information" was submitted and approval for such installation was given on

or about October 4, 2005. (Government Exhibit 4) (T.26).  Nevertheless, the

investigating agents concluded "that the only way for [them] to try to identify additional

individuals and expand the scope of the investigation to include those individuals [they]

didn't currently have identified was to apply for a federal court authorized wire

communications interception under Title III" since this "would give [them] the ability to

listen to the conversations that the subjects were having regarding their activities and

other associates that [they] didn't have identified."  (T. 10-11).  Also, by having access

to such conversations, the agents would "know when [the suspects] have observed

[them]" and would enable them "to know sometimes what [the suspects] are thinking;

where they're going, what they're going to be doing; when they're going to be doing it."

(T. 11).

S.A. John A. Yervelli, Jr. executed a ninety-five (95) page affidavit which he swore to on October 25, 2005 before the Hon. William M. Skretny in support of the Government's application for an order authorizing the interception of wire communications.  (Government Exhibit 1).  This affidavit of S.A. Yervelli describes in great detail the history of the investigation to date and information obtained based on prior state wiretap orders, use of confidential informants, physical surveillance, pen registers and review of various records.  However, there is no mention made in the affidavit as to the use of pole cameras or why such use was not feasible or whether any sort of evaluation had been made concerning the use of pole cameras notwithstanding that S.A. Yervelli "thought about using pole cameras as an investigative technique sometime in September 2005" and had received authorization for the installation of such cameras prior to submitting his affidavit  to Judge Skretny. (T. 22, 61, 76-77,81,85, 92) (Government Exhibit 4).  In explaining why no mention was made of a contemplated use of pole cameras in his affidavit, S.A. Yervelli testified that he believed that the use of pole cameras "was just a continuation of physical surveillance" and that they would not have obtained any additional evidence. (T.23,33, 77). He considered the pole camera surveillance to be "the same thing" as physical surveillance except that the agents would not have to be physically present and run the risk of being observed by those being investigated. Since he considered the pole camera usage to be "an enhancement of physical surveillance" that "was going to support [their physical] surveillances", which he did describe in his affidavit sworn to October 25, 2005 he did not think that it was necessary to specifically make mention of the possible use of pole cameras. (T.33, 73,79-80, 81-82, 94) (Government Exhibit 1 pp. 82-85).

On October 25, 2005 an "Order Authorizing The Interception Of Wire Communications" was granted by the Honorable William M. Skretny authorizing the interception of wire communications relating to the investigation of the defendants herein. (Government Exhibit 1).  Sometime after the granting of this Order, site surveys were conducted for the purpose of installing pole cameras and technical equipment was obtained. (T.28). However, no attempt was made to file a "supplemental affidavit" with Judge Skretny as to "necessity" and the use or evaluation on the use of pole cameras. (T.86).

Upon application by government counsel, this Court issued an order on November 1, 2005 and on November 8, 2005 authorizing the installation of telephone lines pursuant to 28 U.S.C. § 1651 for the purpose of servicing pole cameras so as to provide for the collection of information relevant to the ongoing investigation of the defendants herein. (Government Exhibits 5 and 6 respectively) (T.29-31).

On November 4, 2005 a "First Ten Day Report" was submitted to Judge Skretny wherein it was reported that:

> FBI personnel are in the process of installing "Pole Cameras" in the area of 258 Hudson Street and the garage located at 1073 Niagara Street. These cameras are necessary to assist with corroboration of information from the wire interceptions and because the subjects of the Investigation are very surveillance conscience. [*sic*].

(Government Exhibit 7) (T.34-35, 37, 87, 91-92).

Thereafter, on November 23, 2005 an application for an order authorizing the continued interception of wire communications in the investigation of the defendants was submitted by the Government to Judge Skretny.  (Government Exhibit 2).  In the affidavit of S.A. Yervelli sworn to November 23, 2005 in support of said application, disclosure is made that one of the "traditional investigative techniques utilized thus far" is the "use of surveillance cameras in public areas near selected locations associated with subjects of this investigation."  (Government Exhibit 2, pp. 82, 89) (T. 51-52).  An "Order Authorizing The Continued Interception of Wire Communications" was granted by Judge Skretny on November 23, 2005.  (Government Exhibit 2) (T. 50).

On December 8, 2005, the Government made an application for a "spinoff eavesdrop warrant," *i.e.*, an authorization to intercept wire communications occurring over another telephone not covered by the prior intercept orders.  (Government Exhibit 3) (T. 52).  In support of this application, S.A. Yervelli, in his affidavit sworn to December 8, 2005, advised that, among other things, pole cameras were used as "surveillance cameras in public areas near selected locations associated with subjects of this investigation" and that those cameras would continue to be used to "assist surveillance units with conducting surveillance in the future."  (Government Exhibit 3, pp. 90, 96-97) (T. 55).

Disclosure of the use of pole cameras was done in the affidavits of S.A. Yervelli sworn to November 23 and December 8, 2005, "because they were now being used and they were there." (T. 56).  An "Order Authorizing The Interception of Wire

6

Communications" was granted by the Honorable William M. Skretny on December 8,

2005.  (Government Exhibit 3).

## DISCUSSION AND ANALYSIS

The defendant argues that "the government had no right to intercept

conversations in violation of Title 18 U.S.C. § 1960(a)."  (Docket #148, p. 25).  Title 18

U.S.C. § 1960(a) has no relevancy whatsoever to the issues at hand and therefore, this

Court is treating that citation as a typographical error or an error due to "cloning" to

which no further discussion is warranted.

The defendant also argues "that probable cause did not exist to establish

the necessary probable cause" [*sic*] and that "the eavesdrop applications failed to

establish necessity for the eavesdropping."  (Docket #148, pp. 25, 29).  He further

claims that there should have been a termination of the October 25, 2005 intercept

order since "the investigative objectives were attained within a short time after the

issuance of the order and that there was no need for subsequent eavesdropping."

(Docket #148, p. 35).

The defendant also claims that "minimization procedures were not

complied with and, as a result, the fruit of the eavesdropping orders must be

suppressed."  (Docket #148, p. 37).  Lastly, the defendant asserts that there may have

been a failure to comply with the "sealing" requirement under the statute.  (Docket #148,

pp. 37-38).

Each of these claims will be separately addressed herein.

**(1)    The Probable Cause Issue**.

As the Second Circuit Court of Appeals has stated, "the standard for probable cause applicable to [18 U.S.C.] § 2518 is 'the same as the standard for a regular search warrant. Under *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), probable cause for a search warrant is established if the totality-of-the-circumstances' indicate a probability of criminal activity.  *See id.* at 230-32, 103 S.Ct. 2317."  *United States v. Diaz*, 176 F.3d 52, 110 (2d Cir.) *cert. denied* by *Rivera v. United States*, 528 U.S. 875 (1999).

Basically, the defendant is requesting that a review of Judge Skretny's decision in issuing the Intercept Orders of October 25, November 23 and December 8, 2005 be made so as to conclude that such orders were improperly issued.  The role of this Court in conducting such a review is no different than that conducted by a court of appeals and therefore, the admonition of the Second Circuit Court of Appeals is appropriately applied in this process wherein the Court stated:

> "In reviewing a ruling on a motion to suppress wiretap evidence, we accord deference to the district court."  *Miller,* 116 F.3d at 663 (quoting *Torres*, 901 F.2d at 231).  Our role in reviewing the issuance of a wiretap order is not to make a *de novo* determination of the sufficiency of the applications, "but to decide if the facts set forth in the application were minimally adequate to support the determination that was made."  *Id.*

*United States v. Diaz,* 176 F.3d 52, 109 (2d Cir.), *cert. denied* by *Rivera v. United*

*States*, 528 U.S. 875 (1999).

Although the defendant sets forth a relatively detailed review of the contents of the affidavit of S.A. Yervelli sworn to October 25, 2005, he fails to put forth anything of substance to support his claim that the intercept application for the October 25, 2005 intercept order does not provide probable cause for the issuance of the order. The defendant merely puts forth a conclusory statement that "it is apparent from the eavesdropping application that probable cause did not exist to establish the necessary probable cause." [*sic*].  (Docket #148, p. 25).  He offers nothing further on the issue of probable cause as to the intercept orders of November 23 and December 8, 2005.

As the Court of Appeals for the Second Circuit stated:

> A plaintiff who argues that a warrant was issued on less than probable cause faces a heavy burden.   "Where [the] circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner. . . . [T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants."   *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965).   In particular, where the officer requesting the search warrant relies on an informant, the magistrate's role is to examine the totality of the circumstances and to
>> make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.   And the duty of a reviewing court is simply to ensure that the

> magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed. *Illinois v. Gates,* 462 U.S. 213, 238-39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)); *see United States v. Feliz-Cordero*, 859 F.2d 250, 252-53 (2d Cir. 1988).

*Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991).

The defendant has failed to meet his burden in this regard.  The ninety-five (95) typewritten page affidavit of S.A. Yervelli sworn to October 25, 2005 sets forth in great detail, the circumstances of the investigation as well as the information obtained to date from confidential sources, authorized state intercept orders and physical surveillance.  As a result, it is hereby RECOMMENDED that defendant's motion to suppress the evidence obtained by use of the intercept orders of October 25, November 23 and December 8, 2005 be DENIED.

**(2)     The Necessity Issue.**

The defendant argues that "it is more than clear that the government / agent utilized eavesdropping as an investigative tool without attempting to consummate their [*sic*] investigation by using other techniques" and that "the conclusory statements and the necessity aspect of the applications were insufficient to allow the agents to utilize eavesdropping in this instance" (Docket #148, p. 31) and therefore, the evidence obtained by use of such intercept orders should be suppressed.  (Docket #148, p. 33).

The eavesdropping application and supporting affidavit of S.A. Yervelli of

October 25, 2005 did contain a detailed factual explanation of the traditional

investigative techniques that were used, including "the use of confidential sources,

controlled evidence purchases of illegal drugs, the attempted introduction of an

undercover officer, search warrants, pen registers, review of telephone toll records,

interviews and **physical surveillance.**"  (Emphasis added) (Government Exhibit 1, p.

77).  A detailed description was also given of those investigative techniques

"considered, but not deemed likely to succeed" and the reasons for such belief.

(Government Exhibit 1, pp. 77-92).


There is no requirement that all traditional law enforcement investigative

techniques be exhausted prior to applying for a wire interception order.  *United States v.*

*Diaz*, 176 F.3d 52, 111 (2d Cir.) *cert. denied* by *Rivera v. United States,* 528 U.S. 875

(1999).  Nor is there any requirement "that any particular investigative procedures

[must] be exhausted before a wiretap may be authorized."  *United States v. Miller,* 116

F.3d 641, 663 (2d Cir. 1997), *cert. denied*, 524 U.S. 905 (1998); *United States v. Young*,

882 F.2d 1234, 1237 (2d Cir. 1987).


Since the holding in *United States v. Torres*, 901 F.2d 205 (2d Cir.), *cert.*

*denied* 498 U.S. 906 (1990), addresses the issues raised by the defendant herein on

the issue of whether 18 U.S.C. § 2518(1)(c) was complied with, it is worthwhile to

sacrifice brevity and set forth that Court's ruling in detail.

> Section 2518(1)(c) requires that an application for such an
> interception shall include "a full and complete statement as
> to whether or not other investigative procedures have been

tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous. . . ."  Similarly, section 2518(3)(c) requires the judge to whom an application for a wiretap is made to determine, as a condition of authorizing the tap, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous. . . ."

The application for the wiretap in this case was based upon a thirty-six page affidavit by DEA agent Timothy J. Sullivan dated May 27, 1987.  Flores contends that when the application for a wiretap was made, traditional law enforcement methods had already achieved "extraordinary success . . . in penetrating the deepest reaches of the Torres Organization," and that the "affidavit utterly failed to establish, even on a superficial level, that less intrusive techniques had not been successful and could not be successful."  In advancing this position, Flores points out that our decision in *United States v. Lilla*, 699 F.2d 99 (2d Cir. 1983), precludes the authorization of wiretaps based upon "generalized and conclusory statements that other investigative procedures would prove unsuccessful," *id.* at 104.  Flores also argues that it does not suffice to show that a case belongs to some general class of cases which require wiretap investigation, citing *United States v. Kalustian*, 529 F.2d 585, 589 (9th Cir. 1975) (gambling case).

We are unpersuaded, and conclude that the application in this case provided a sufficient basis for authorizing the Flores wiretap.  Section 2518 "is simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime."  *United States v. Kahn*, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974).  As we have stated:

> "[T]he purpose of the statutory requirements is not to preclude resort to electronic surveillance until after all other possible means of investigation have been exhausted by investigative agents; rather, they only require that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods."

*United States v. Vazquez*, 605 F.2d 1269, 1282 (2d Cir. 1979) (quoting *United States v. Hinton*, 543 F.2d 1002, 1011 (2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976)), *cert. denied*, 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979), 1019, 100 S.Ct. 674, 62 L.Ed.2d 649 (1980); *see also United States v. Fury*, 554 F.2d 522, 530 (2d Cir), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977).

The role of an appeals court in reviewing the issuance of a wiretap order, furthermore, "is not to make a *de novo* determination of sufficiency as if it were a district judge, but to decide if the facts set forth in the application were minimally adequate to support the determination that was made."  *United States v. Scibelli*, 549 F.2d 222, 226 (1st Cir.) (collecting cases), *cert. denied*, 431 U.S. 960, 97 S.Ct. 2687, 53 L.Ed.2d 278 (1977).  And, as the *Scibelli* court went on to say:

> [I]n determining the sufficiency of the application a reviewing court must test it in a practical and common sense manner.  The legislative history makes clear that section 2518(1)(c) is not designed to force the Government to have exhausted all "other investigative procedures".
>
> > "The judgment [of the district judge] would involve a consideration of all the facts and circumstances.  Normal investigative procedure would include, for example, standard visual or aural surveillance techniques by law enforcement officers, general questioning or interrogation under an immunity grant, use of regular search warrants, and the infiltration of conspiratorial groups by undercover agents or informants.  Merely because a normal investigative technique is theoretically possible, it does not follow that it is likely.  What the

13

> provision envisions is that the
> showing be tested in a practical
> and commonsense fashion.
>
> S.Rep. No. 1097, 90th Cong., 2d Sess., 1968
> U.S.Code Cong. & Admin.News, p. 2190
> (citations omitted).
>
> *Scibelli*, 549 F.2d at 226.

*Id.* at 231-232) (brackets included); *See also United States v. Diaz,* 176 F.3d 52, 111 (2d Cir.), *cert. denied* by *Rivera v. United States*, 528 U.S. 875 (1999).

Giving proper deference to Judge Skretny's review and acceptance of the ninety-five (95) page affidavit of Special Agent Yervelli sworn to October 25, 2005 in support of the application for the Intercept Orders and his decision to grant said applications and issue the orders in question, it is concluded that Judge Skretny "properly found that conventional investigative techniques had been exhausted and that alternatives to wire interception would be unlikely to succeed or would be too dangerous." *Id. at* 111. Therefore, it is RECOMMENDED that defendant's motion to suppress based on this claim be DENIED.

**(3)     Defendant's Claim of Failure to Terminate the Interceptions.**

The defendant asserts that "the objectives necessary [*sic*] were obtained prior to the first eavesdrop warrant in October 2005" and that "nevertheless, within a short time after the issuance of the October 25, 2005 eavesdrop warrant order, the investigative objectives were attained and there was no need for subsequent eavesdropping." (Docket #148, p. 35). As a result, the defendant states that "the

14

defense is entitled to have all of the subsequent eavesdrop orders controverted which were derived from the illegal electronic surveillance." (Docket #148, p. 36).

18 U.S.C. § 2518(5) provides in pertinent part:

Every order and extension therefore shall contain a provision that the authorization to intercept . . . must terminate upon attainment of the authorized objection . . ..

In his affidavit sworn to October 25, 2005, S.A. Yervelli states "that only through the interception of wire communications to and from the target telephones can the full scope of this conspiracy be discovered and evidence for successful prosecution of the subjects involved be obtained." (Government Exhibit 1, p. 91).

In his affidavit sworn to November 23, 2005, S.A. Yervelli states:

However, the full scope of all the members of this drug organization has not yet been fully identified, nor in particular, have the suppliers of the drugs, the method of drug supply, the means of financing the purchase of drugs, or the locations where drugs and proceeds were stored and method of disposing of drug proceeds.  Continued interception of the wire communications of these individuals appears to be the only means to determine this information.

Government Exhibit 2, pp. 81-82.

A similar sworn statement of S.A. Yervelli is contained in his affidavit sworn to December 8, 2005 in support of the application for the intercept order of December 8, 2005.  *See* Government Exhibit 3, pp. 89-90.

Since the identities of others involved in the conspiracy and illegal drug operations had not been established, the "objective of the surveillance had not been attained" as of October 25, 2005 and therefore, there was an established need for the Order of October 25, 2005.  Because the objectives of the investigation had not been obtained during the authorized period established in the October 25, 2005 Order, the affidavits of S.A. Yervelli sworn to November 23 and December 8 further established the necessity for extending the authorization to electronically intercept communications over the target telephones thereby warranting the issuance of the Orders of November 23 and December 8, 2005.  *See United States v. Wong*, 40 F.3d 1347, 1376 (2d Cir. 1994); *cert. denied* 514 U.S. 1113 (1995); *United States v. Earls*, 42 F.3d 1321, 1325 (10th Cir. 1994); *United States v. Brown*, 941 F.2d 656, 659 (8th Cir. 1991).

Giving proper deference to Judge Skretny's review and acceptance of the ninety-five (95) page affidavit of S.A. Yervelli sworn to October 25, 2005 in support of the application for the Intercept Order of October 25, 2005, as well as Judge Skretny's review and acceptance of the application of November 23, 2005 to extend said interceptions, and his review and acceptance of the application of December 8, 2005 to further extend the authorization to intercept, it is concluded that Judge Skretny "properly found that conventional investigative techniques had been exhausted and that alternatives to wire interception would be unlikely to succeed or would be too dangerous" and that the objectives of the investigation had not been attained thereby necessitating the Orders of October 25, November 23 and December 8, 2005.

Therefore, it is RECOMMENDED that defendant's motion to suppress the electronic evidence on the basis of "non-necessity" and/or "attainment of objective" be DENIED.

**(4)    The "Minimization" Issue.**

18 U.S.C. § 2518(5) provides that the "authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter . . .."

Defendant's counsel merely speculates that the "minimization" requirements of the statute may not have been complied with.  However, he admits that he "has not been able to listen to the tapes."  (Docket #148, p. 37).  As a result, his argument is rejected at this point in time.  Nevertheless, for purposes of judicial economy, the holding of the United States Supreme Court on this issue is beneficial and is therefore, set forth herein.

In addressing this complex concept of "minimization," the United States Supreme Court has held that:

> The statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to "minimize" the interception of such conversations.  Whether the agents have in fact conducted the wiretap in such a manner will depend on the facts and circumstances of each case.
>
> We agree with the Court of Appeals that blind reliance on the percentage of nonpertinent calls intercepted is not a sure

17

guide to the correct answer.  Such percentages may provide
assistance, but there are surely cases, such as the one at
bar, where the percentage of nonpertinent calls is relatively
high and yet their interception was still reasonable.  The
reasons for this may be many.  Many of the nonpertinent
calls may have been very short.  Others may have been
one-time only calls.  Still other calls may have been
ambiguous in nature or apparently involved guarded or
coded language.  In all these circumstances agents can
hardly be expected to know that the calls are not pertinent
prior to their termination.

In determining whether the agents properly minimized, it is
also important to consider the circumstances of the wiretap.
For example, when the investigation is focusing on what is
thought to be a widespread conspiracy more extensive
surveillance may be justified in an attempt to determine the
precise scope of the enterprise.  And it is possible that many
more of the conversations will be permissibly interceptable
because they will involve one or more of the co-conspirators.
. . .

Other factors may also play a significant part in a particular
case.  For example, it may be important to determine at
exactly what point during the authorized period the
interception was made.  During the early stages of
surveillance the agents may be forced to intercept all calls to
establish categories of nonpertinent calls which will not be
intercepted thereafter.  Interception of those same types of
calls might be unreasonable later on, however, once the
nonpertinent categories have been established and it is clear
that this particular conversation is of that type.  Other
situations may arise where patterns of nonpertinent calls do
not appear.  In these circumstances it may not be
unreasonable to intercept almost every short conversation
because the determination of relevancy cannot be made
before the call is completed.

*Scott v. United States*, 436 U.S. 128, 140-141 (1978); *see also United States v.
Principe*, 531 F.2d 1132, 1140 (2d Cir.), *cert. denied* 430 U.S. 905 (1976).

It is therefore RECOMMENDED that defendant's motion to suppress the

evidence on this issue be DENIED.

**(5)     The "Sealing" Issue.**

The defendant requests that "a hearing to determine the reasons and lengths of various delays [*sic*] and whether, under the circumstances, the tapes must be suppressed."  (Docket #148, p. 38).

18 U.S.C. § 2518(8)(a) provides as follows:

> Immediately upon the expiration of the period of the order, or
> extensions thereof, such recordings shall be made available
> to the judge issuing such order and sealed under his
> directions.

The term "immediately" has been given a liberal interpretation by the Court of Appeals for the Second Circuit for purposes of determining issues related to claims of untimely sealing of tapes as evidenced by the following:

> This Court has held that a sealing "within one or two days"
> will normally be deemed immediate within the meaning of
> § 2518(8)(a), *United States v. Maldonado-Rivera,* 922 F.2d
> 934, 949 (2d Cir. 1990) (quoting *United States v. Vasquez*,
> 605 F.2d 1269, 1278 (2d Cir. 1979); *cert. denied*, 444 U.S.
> 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979), 444 U.S. 1019,
> 100 S.Ct. 2811, 115 L.Ed.2d 984, 501 U.S. 1233, 111 S.Ct.
> 2858, 115 L.Ed.2d 1025 (1991) and that longer delays
> require suppression "unless the government furnishes an
> explanation for the delay that is 'satisfactory' within the
> meaning of the statute."  *Id*., *see supra* note 5.  Where the
> delay is between two and five days, we have indicated that
> the government should submit with the tapes an *in camera*

explanation for the delay, *see United States v. Massino*, 784 F.2d 153, 158 (2d Cir. 1986), although an explanation submitted at the time of a defendant's motion to suppress will be considered.  *See United States v. Pitera*, 5 F.3d 624, 627 (2d Cir. 1993), *cert. denied*, ___ U.S. ___, 114 S.Ct. 1103, 127 L.Ed.2d 415 (1994).

We have recognized that weekends and holidays present legitimate obstacles to the sealing of tapes.  *See, e.g., United States v. Gallo*, 863 F.2d 185, 193 (2d Cir. 1988), *cert. denied*, 489 U.S. 1083, 109 S.Ct. 1539, 103 L.Ed.2d 843 (1989); *United States v. McGrath*, 622 F.2d 36, 42-43 (2d Cir. 1980).

*United States v. Wong*, 40 F.3d 1347, 1375 (2d Cir. 1994).

The Second Circuit Court of Appeals has also held that failure to "immediately" seal does not automatically cause suppression of the evidence.  As the Court expressly stated in *United States v. Gallo*, 863 F.2d 185, 193 (2d Cir. 1988), *cert. denied*, 484 U.S. 1083 (1989):

It is well settled in this circuit that suppression is not automatically warranted when sealing is not immediate; rather, suppression is required when the government cannot satisfactorily explain the delay.  (Citations omitted).  The government's explanation must be weighed against such factors as the length of the delay, the absence of good faith, the time needed for administrative processing, and the prejudice to the defendant.  *See Massino*, 784 F.2d at 157. We find that the government has satisfactorily explained the five-day sealing delay that occurred here.  The authorizing order expired on March 6, 1982 - a Saturday - rendering any action by the government on the next day impossible.  The government then required 3 days - March 8, 9 and 10 - for administrative processing, and the tapes were sealed on March 11, 1982.  The record contains no evidence of bad faith on the part of the government, or of prejudice incurred on the part of the appellants.  We therefore find no error in the district court's denial of the defendant's motion to

suppress the fruits of the *Ruggerio* surveillance.

*See also U.S. v. Pitera*, 5 F.3d 624, 627 (2d Cir. 1993), *cert. denied* 570 U.S. 1134 (1994).

Since the defendant has failed to offer anything of substance that would minimally establish a basis for the need to have a hearing on the issue of minimization, it is RECOMMENDED that his motion on this issue be DENIED.

**B.    Defendant's Motion to Suppress Evidence Seized Pursuant to the Search Warrant of December 14, 2005.**

### FACTS

On December 14, 2005, Judge Scott issued a search warrant authorizing the search of "One 1997 Red Mercury Villager Van, Bearing VIN # 4M2DV1111VDJ43887 based on the affidavit of S.A. Gary N. Violanti of the F.B.I. sworn to December 14, 2005. In that affidavit, S.A. Violanti describes in some detail, the investigation that was being conducted into the alleged drug activities of Enrique Sexto, Luis Pabon and Jose Lao whom he describes as "known narcotics transporters/traffickers in the Buffalo, New York area within the Western District of New York."  He further asserts that "Pabon, Sexto, Lao and others are known to utilize vehicles belonging to themselves and others associated with them to transport and facilitate the transportation of multi-ounce quantities of controlled substances, including heroin and cocaine, in areas including Buffalo, New York" which is thereafter "distributed in the Western District of New York through a variety of mid-level dealers within Pabon and Sexto's narcotic trafficking organization."  Based on

"court authorized intercepts" and "circumstances contained in [his] affidavit," S.A. Violanti advises that "Jose Madera and another unidentified male, traveling in the [1997 red Mercury Village suburban bearing . . . New York State registration #BVA3125 . . . registered to an Amarilis A. Calderon, D.O.B. 10/1/64, at 3671 Broadway, A27, New York, New York] are responsible for delivering an unspecified amount of heroin to Sexto and Pabon and are, as a result, are [*sic*] currently in possession of illegal proceeds and/or controlled substances."  The investigation established that Jose Madera "was a registered guest on December 6, 2005 at the Holiday Inn located at 1881 Niagara Falls Blvd., Amherst, New York" and S.A. Violanti opined that "Jose Madera was responsible for delivering a shipment of illegal drugs to Sexto and Pabon."  S.A. Violanti further asserts that the residence of Sexto at 452 Fargo Avenue, Buffalo, New York, has been established to be "utilized by both Pabon and Sexto to facilitate their illegal drug trafficking activities."  The red Mercury Villager Van was "observed on the street next to [this] residence," and while under continued surveillance, was observed going to the Holiday Inn where Jose Madera was a guest.  As a result, it was the belief of S.A. Violanti that probable cause existed that contraband and other evidence relating to drug trafficking would be found in the vehicle in question.  The search warrant for the vehicle was issued and on December 14, 2005, the vehicle was stopped on the New York State Thruway in the vicinity of Batavia, New York and a search conducted pursuant to the warrant.  The driver of the vehicle was Jose Madera.

## DISCUSSION AND ANALYSIS

The defendant claims that the statements set forth in the affidavit of S.A.

Violanti sworn to December 14, 2005 "provided absolutely no probable cause to believe that the vehicle was in anyway connected with any criminal activity on December 13, 2005."  (Docket #148, p. 41) and therefore, "all of the items seized as a result of the execution of the search warrant" should be suppressed.  (Docket #148, p. 42).

Great deference should be given to Judge Scott's decision to issue the search warrant in question.  *Illinois v. Gates,* 462 U.S. 213, 236 (1983); *Ornealas v. United States,* 517 U.S. 690, 696 (1996).

In determining whether probable cause exists for the issuance of a warrant, the United States Supreme Court has stated:

> The totality of the circumstances approach is far more consistent with our prior treatment of probable cause than is any rigid demand that specific "tests" be satisfied by every informant's tip.  Perhaps the central teaching of our decisions bearing on the probable-cause standard is that it is a "practical, nontechnical conception."  (citation omitted).  "In dealing with probable cause, . . . as the very name implies, we deal with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." (citation omitted.)

> In *Aguilar,* we required only that "the magistrate must be informed of *some of the underlying circumstances* from which the informant concluded that . . . narcotics were where he claimed they were, and *some of the underlying circumstances* from which the officer concluded that the informant . . . was "credible" or his information "reliable."  (citation omitted).

> As our language indicates, we intended neither a rigid

compartmentalization of the inquiries into an informant's "veracity," "reliability," and "basis of knowledge," nor that these inquiries be elaborate exegeses of an informant's tip. Rather, we required only that *some* facts bearing on two particular issues be provided to the magistrate.

*   *   *

The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis . . . for [conclud[ing] "that probable cause existed. (citation omitted). We are convinced that this flexible, easily applied standard will better achieve the accommodation of public and private interests that the Fourth Amendment requires than does the approach that has developed from *Aguilar* and *Spinelli*.

*Illinois v. Gates*, 462 U.S. 213, 231, 238-239 (1983).

It is also pointed out that the training and experience of an agent can be considered in determining whether probable cause exists. *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985); *cert. denied*, 486 U.S. 1043 (1987).

As the Court of Appeals for the Second Circuit stated:

A plaintiff who argues that a warrant was issued on less than probable cause faces a heavy burden. "Where [the] circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner. . . . [T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *United States v.*

24

> *Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684
> (1965).  In particular, where the officer requesting the search
> warrant relies on an informant, the magistrate's role is to
> examine the totality of the circumstances and to
>> make a practical, commonsense decision whether,
>> given all the circumstances set forth in the affidavit
>> before him, including the "veracity" and "basis of
>> knowledge" of persons supplying hearsay
>> information, there is a fair probability that
>> contraband or evidence of a crime will be found in
>> a particular place.  And the duty of a reviewing
>> court is simply to ensure that the magistrate had a
>> "substantial basis for . . . conclud[ing]" that
>> probable cause existed.
>
> *Illinois v. Gates,* 462 U.S. 213, 238-39, 103 S.Ct. 2317, 2332, 76
> L.Ed.2d 527 (1983) (quoting *Jones v. United States*, 362 U.S.
> 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)); *see United
> States v. Feliz-Cordero*, 859 F.2d 250, 252-53 (2d Cir. 1988).

*Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991).


I find that the defendant has failed in his burden to invalidate the search

warrant issued by Magistrate Judge Scott on December 14, 2005 and that his argument

that probable cause was lacking for issuance of that warrant is without legal merit.

Therefore, it is recommended that his motion to suppress the evidence seized pursuant to

that warrant on this basis be DENIED.


Contrary to the defendant's assertion, the search warrant, as well as the

affidavit of S.A. Violanti in support of the application for the warrant, sets forth a detailed

description of the motor vehicle, including the motor vehicle identification number, as well

as the New York State registration identification, that is to be searched.  Further, the

search warrant of December 14, 2005 expressly references the affidavit of S.A. Violanti

sworn to December 14, 2005 and expressly incorporates that affidavit by reference.  This

affidavit of S.A. Violanti describes with specificity the items to be seized under the search

warrant and the search warrant has a detailed schedule of items to be seized attached to

it, which schedule of items is also expressly referenced in the main body of the search

warrant.  Even if it were determined that the search warrant failed to particularly describe

the items to be seized, such failure would not render the warrant incurably defective.

*United States v. Bianco*, 998 F.2d 1112, 1116 (2d Cir. 1993).


Lastly, the defendant has failed to come forward with anything that would

nullify the application of the "good faith" doctrine established under *United States v. Leon*,

468 U.S. 897, 920 (1984) in this case.


> [S]uppression of evidence obtained pursuant to a warrant
> should be ordered only on a case-by-case basis and only in
> those unusual cases in which exclusion will further the
> purposes of the exclusionary rule.
>
> *    *    *
>
> It is the magistrate's responsibility to determine whether the
> officer's allegations establish probable cause and, if so, to
> issue a warrant comporting in form with the requirements of
> the Fourth Amendment.  In the ordinary case, an officer
> cannot be expected to question the magistrate's probable-
> cause determination or his judgment that the form of the
> warrant is technically sufficient.  "[O]nce the warrant issues,
> there is literally nothing more the policeman can do in seeking
> to comply with the law."  (citation omitted).  Penalizing the
> officer for the magistrate's error, rather than his own, cannot
> logically contribute to the deterrence of Fourth Amendment
> violations.

*Id.* at 918, 921.

As a result, suppression of evidence as sought by the defendant is not warranted and it is therefore RECOMMENDED that defendant's motion be DENIED.

## CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that defendants' motion (Docket #148), to suppress be **DENIED**.

Therefore, it is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed. R. Crim. P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance.  *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).  **Failure to file objections within the specified time or to request an extension of such time**

waives the right to appeal the District Judge's Order.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).


The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2 (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.**

/s/ H. Kenneth Schroeder, Jr.

_____
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**


**DATED:**    **Buffalo, New York**
              **May19, 2008**